May it please the Court, I'd like to reserve a few minutes for rebuttal. My name is Troy Eide, I'm Counselor for Mr. Skywalk. Watch your clock. Watch the clock. We've been pursuing this action, Your Honors, for eight months now. We've never yet had an opportunity since our intangible property right was condemned and our property seized to have an evidentiary hearing in any court. We've never been able to question a single tribal official on the record in a sworn statement in any kind of a proceeding. And so I'm here for really four reasons. First of all is that the tribe cannot condemn property that's cited off the reservation. This is plainly a case where there are plenty of sovereign powers the Hualapai Nation enjoys, but extraterritorial condemnation is not one of them. Second... So is that a CITES problem? Is that what you're arguing? It's a CITES problem, sir, it really is. Why shouldn't we apply the CITES test in R.J. Williams? Well, R.J. Williams is dubious, as the Ninth Circuit itself has said. I don't think it's good law. So we should just ignore it? Well, I think to the extent that... If it's just a bad Ninth Circuit panel that went astray. Well, even if you don't ignore it, I think you probably should overrule it, but even if you don't overrule it... A three-judge panel... We do that with a three-judge panel. Well, I think footnote 8 of Iowa Mutual overrules it. And I think that Stock West, which is the case from 1989, the Ninth Circuit said it was dubious. But even if we assume it's good law, let's take those contacts. And Judge Tallman, let's go through them. This contract was envisioned in Las Vegas. It's where it was negotiated. That's where the parties met. That's where they came up with this. And the Skywalk is itself a unique tourist venture. For every few minutes you spend out on the Glass Bridge, which, by the way, we don't own. We never have owned any of the real property there, there is a marketing sales function. It goes all over the world. Our mission was to try to attract visitors, and we brought a third of them to the Skywalk, but more than half of those come from overseas. We're talking about marketing, selling tickets in China, doing trade shows there. Even the vehicles, everything that we maintained, the food service, it's such a remote place we had to run all of that business. We're a management services company. That's what we do. It's like a Marriott, if you will. If Marriott would build a hotel out of Grand Canyon West. Did GCSD know that its operations on tribal land were going to be subject to tribal laws when it entered into the contract? Well, that's not what the contract says. I mean, it talks about both. I asked, did GCSD know that? It seems to me they did. What GCSD knew was that a tribal corporation would enter into a contract to do arbitration, that that would be the remedy. And that's what they purported to take. It does more than that. I mean, the contract specifically incorporates the law of the nation, does it not? And the law of Arizona. And it's critical because, for example, the tribe is a third-party bank. Let's just focus on Judge Callahan's questions. There's no – the parties acknowledge in the contract, in writing, that they will comply with appropriate tribal laws, do they not? But even your opinion, sir, in the Burlington Northern v. Vaughn case, when tribal officials go beyond the scope of what tribal law allows, we have the ability to have federal relief. Well, that's not the question. You're trying to change the question. My question is a very straightforward one. There's a provision in the contract that references Arizona and the laws of the nation. So both apply. Incorporated in the contract. Yes. Okay. And so for much of the contract language, just to answer the question directly, much of that is Arizona law. Some of it is wallop by law. And we're not contesting, for example, that the tribe can have an eminent domain authority or have that power. It's where they exercise it. It's where the situs of the property is located. Well, the situs of the property is located on the reservation. Yes, sir, but we never owned that property. All we ever had was a management services agreement. The consideration we paid for that was the building. Didn't you construct the skywalk? Yes, but we never owned it, sir. We never owned it. But that's where the contract was to be executed. Isn't that right? Well, most of the contract, frankly, sir, is not executed on the reservation. But this is a multimillion-dollar structure we're talking about here, and it's located in the heart of the reservation. It's a non-tribal land. On tribal land. But we don't own it. We don't have any real property. That's why this is not a water wheel case and so forth. You're managing that structure for the tribe, and you're employing, what, a couple of hundred employees, many of whom I presume were members of the tribe. Well, we did before they were fired by the tribe. Counsel, you may want to let the judges finish their question. You'll wind up answering the wrong question. Yes. Well, so the question was your client employed several hundred employees, many of whom were members of the tribe, correct? We did employ many employees. That's right, sir. No question about that. So let's go back to the R.J. Williams, okay? I take your point that the contract was negotiated in Las Vegas. That takes care of one factor. The place that the contract is going to be executed appears to me to be on the reservation. And I would disagree with that. The place of performance is on the reservation. The location of the subject matter of the contract is on the reservation. And the place of residence of the parties includes the tribal corporation, which is presumably on the reservation, and then your Nevada corporation. So applying those five factors, wouldn't it be reasonable for Judge Campbell to conclude that the situs of this contract was in Indian country? I don't think so, Your Honor, for the reasons I've stated. The vast majority of this business, it's intangible. It's off reservation. Well, but then let's even say, but, okay, that you don't think so. But then you also argue that the tribe has no jurisdiction over an intangible rights because they are located in you say the rights are located in Nevada, right? Correct, yes. But why can't you make that argument before the tribal court? Because you've done so. I mean, people always make those arguments in a place where they say, you don't have jurisdiction because it should be over here. Absolutely. And here's why. This case is different. We've satisfied all the exceptions under National Farmers Union. The record is clear that we've done so. And in those instances, it's up to this Court to determine what the scope of the Federal right is. And let me just say, the tribe brought this on itself through the ordinance. The whole concept of tribal court exhaustion, Your Honor, if you read National Farmers Union, it talks about the Federal policy. Why do we have comity considerations? Because we want tribal courts to be able to exercise the judicial function. And it talks about developing a record and so on. That is prohibited in this case by the ordinance the tribal council passed. They stripped the tribal court of its authority to act as a judiciary. That's the difference in this case of why it's different from the other cases that have been cited and discussed. It's very important to understand that when an ordinance says that judges are not allowed to grant injunctive relief, which we would need to seek, they're not allowed to consider anything other than whether a taking was for a public use. They can't even appoint a judge pro tem. They're not allowed to the taking best as soon as the tribal council decides that there has been a taking, and then all we can do is argue over whether it was for a public use. The valuation, when it happens, it will be another, at least until April, if we're lucky. The judge hasn't determined his jurisdiction yet. But if we get to that point, it will be another 180 days under the ordinance before we could ever receive compensation, and even then it can be extended indefinitely. It's this ordinance that's different, Your Honor. It's the fact that the law is different. But there's nothing that it says because tribal courts are different that it doesn't mean you don't have to exhaust. Yes. National Farmers says it's different. And I would just ask you to read, if you read, why we have this comedy exception. And it's valuable. And I'm not questioning that it has a purpose. But the policy the feds are trying to advance is to respect tribal courts performing judicial functions. The tribal council could have just let this be a tribal court, like many I practice in. Instead, they stripped the power from these judges. That's what's different about this. The law says it. And if all we can do is make some oblique collateral challenge to this under organic law or their authority, we're at a disadvantage. This drags out indefinitely. It's not what National Farmers envisioned. So is your argument really delay here, that you're somehow being prejudiced because you have to first exhaust your tribal remedies? Because Judge Campbell's order doesn't say you can't come back to federal court. He dismissed your complaint without prejudice in order to permit you to exhaust. Well, we're under a resolution now from the tribe that we can't conduct any business on the reservation. So we can't get our business back. We're not able to perform our management services obligations. That doesn't say that the district court won't ultimately take jurisdiction over this dispute. What it says is I'm not going to do it now until you exhaust your remedies in tribal court. Well, and the point there, sir, is that I think under National Farmers it's clear that if the judiciary can't function as a judiciary, you don't have to defer to us. But based on what I've seen, there's no evidence that the judiciary is not functioning. I mean, you guys have been peppering us with motions to supplement the record on tribal court. It's like we have a very active tribal court and a tribal court of appeals and that litigation is proceeding in the tribal courts. We've had no ability to present evidence and so on, as I've mentioned. So your argument really is delay, that you don't want to have to take the time that it is taking to exhaust your remedies in tribal court. You want to short-circuit that path and go back to federal district court. Part of the argument is delay because it's futility and that's Nevada v. Hicks, but it's a lot more to it than that. If delay serves no other purpose but to delay, and the ordinance says that it serves no purpose, this Court cannot grant us the relief we seek. The ordinance says that, Your Honors. That's what's different than these other cases. It's an extreme exercise of tribal sovereignty that is violative of the policy of National Farmers as to why you extend comity to a tribal court. The Tribal Council chose to hamper, to tie the hands of this tribal court. That's why this case is different than the other cases. And that's why this ordinance is at the heart of this case, Your Honors. And that is what makes it different. It satisfies the bad faith exception, as we've talked about, but it's also futile for the reasons I just pointed out. It's harassing. And beyond that, it violates Montana's main rule, because they cannot deprive us of our property. Kennedy. What you have from the tribal court at this point is we need to make sure that we have jurisdiction, because you had an arbitration clause in your contract, which is making it difficult for the tribal court to figure out what jurisdiction it retained. But your argument seems to be not a contract-based argument. It's an argument against the Tribal Council for adopting the condemnation ordinance. And it may very well be that the tribal court will say, We have jurisdiction to consider that challenge, because that's a separate question apart from the contract. Well, my response to that, Your Honor, is that the speculative hope that this might be upheld at some point is not sufficient. The Cobell case in the Ninth Circuit is a great example of that, 1974. An early case, but very similar to this one. The issue here, sir, is that there was not even the authority under the ordinance to appoint a judge pro tempore. We don't even know what that power will be, whether it will be appealed, whether it will ultimately be respected by the Tribal Council, which wrote the ordinance and said you can't do that. But don't you now have an arbitration award? And so then the next question is, where does it get registered? Well, that's enforceable in Federal court, and we have those proceedings, sir. And you're quite correct that the tribal court, Judge Pro Tempore, Judge King, has said that those proceedings can't be enjoined by the tribal court. So then I'm back to my question. I don't understand how your client is prejudiced by having it exhausted. Well, we've lost millions of dollars. We've had, you know, 100 employees were let go, and we've not had access to our property or any place else. But don't you have an arbitration award in the amount of some 20-some-odd million dollars? Yes, we do have an arbitral award, sir, and we're now enforcing that in Federal court, so. So I'm still at a loss to understand why you can't exhaust your remedies. Well, I think it's just because the tribe was not willing to – they've prevented any sort of recourse in terms of their participation in this arbitration proceeding from the get-go. Well, at their peril. Now they're looking at a 20-some-odd million dollar arbitration award. Well, I think that that's fine that they're looking at that. I have no objection to that. You may want to save the rest of your time. You're below three minutes. No, I think that that's good. I'll do that, and thank you for the prompt, Judge Fischer. Thank you. Good morning, Your Honors. May it please the Court. Jeffrey Gross, Gallagher & Kennedy, here for the appellees. With me at counsel table is Glenn Hallman, also of Gallagher & Kennedy. To accept appellant's position, you would have to decide as a matter of law, as a matter of law, that a tribe plainly has no, absolutely no jurisdiction over a nonmember who comes on to a tribal reservation to conduct business, to hire tribal members, and agrees to comply with Walla Pye law. And that without any evidence, no evidence whatsoever, that that litigant would not be deprived of a fair and meaningful trial in tribal court, that the tribal court cannot determine its own jurisdiction and decide the case on its merits. And that's why we're here. What is the exhaustion doctrine, and why does it apply, and why there are no exceptions to it? So is there a distinction between the contract-based claim, which has been arbitrated and has now resulted in an award, and a challenge to the action by the legislative slash executive branch of the tribe to pass a condemnation ordinance? Well, if I understand your question, Judge Talmadge, the arbitration has to do with a case G.C.S.D. brought against S.N.W. Correct. S.N.U.A. Right. For breach of contract and other wrongful acts, which was decided in the arbitration. The other case involving the condemnation was a case that originally Tron filed against G.C.S.D. to condemn its contract right, and then G.C.S.D. took to Federal court to try to have that case enjoined. So the two cases are different. Although they are obviously interrelated. They're interrelated because they arise out of the same facts and events, but it's two different sources of relief, G.C.S.D. trying to obtain contract rights against S.N.W. and then the, in the condemnation case, the tribe condemning G.C.S.D.'s interest in the contract. Well, so if they condemn the rights in the tribal proceedings, does that have any effect on the arbitration? We believe it has no effect on the arbitration. Okay. Other than there may be some facts and common issues about the enforceability of the arbitration because of S.N.W.'s position as a tribally chartered corporation that's also has sovereign immunity. Well, if it's saying if you condemn the rights, they can't enforce it? No. If we condemn the rights, if we condemn their rights, they, if we condemn their rights in the condemnation case, then the tribe has to pay G.C.S.D. just compensation. And ultimately, that's what's going to happen in tribal court. I thought the intent of the ordinance was essentially to step into the shoes of G.C.S.D., which was the justification for not participating further in the arbitration because, in essence, the tribe's position was we're suing ourselves. That's correct. And that's why. Why isn't the answer to Judge Callahan's question, yes, if we win in our condemnation case, then G.C.S.D. gets nothing because the tribe can essentially say we're not going to enforce the arbitration award against the tribal corporation? No. I think that's two different things. Isn't that what you're, what. One is, one is, there's this arbitration award involving S.N.W.'s alleged breach of contract and other bad stuff. Right. And G.C.S.D. sued S.N.W. and got an arbitration award of $28 million. Right. The tribe said we are condemning G.C.S.D.'s interest, and so we step into the shoes of G.C.S.D. for purposes of the arbitration, and that is now moot because we don't want to sue ourselves. But in the condemnation case, in tribal court, G.C.S.D. has a contract interest that's going to be subject to payment of just compensation for its taking. But I thought those interests were condemned by the ordinance. The contract interests were condemned. But you have to pay just compensation for the interest. Correct. Yes, correct. Okay. As a result of the condemnation act. As a result of the condemnation act. So they are, I mean, there's some interrelationship there, but we are not contending that G.C.S.D. is entitled to nothing. Okay. In the condemnation case. Frankly, I couldn't understand. This case was complicated enough before the tribal council enacted the ordinance, but trying to sort this all out is difficult. Yes. So we, and I agree, made no less complex by the law that we're here to discuss. But it's clear that in the, when the tribal court condemnation case moves forward, it's going to be a basically a plain vanilla condemnation case where the parties are going to get appraisers and they're going to go into court and they're going to value G.C.S.D.'s contract rights. And at the end of that, there's going to be an award of just compensation. Why wouldn't the measure of G.C.S.D.'s rights be the amount of the arbitration award? G.C.S.D. may take that position. I assume they will. I assume they will. At least as part of it. The arbitration award was for damages that G.C.S.D. had suffered through December 31, 2011. The arbitration, the condemnation was initiated in February of 2012. So our position is that G.C.S.D. has rights, is entitled to compensation for the rights in the contract and whatever compensation they would get under the agreement going forward. And G.C.S.D. and the arbitration, that damages calculation was based on a looking backwards perspective, what they had suffered to date. So Judge Fischer is right that the arbitration award is the floor, but they're going to ask for more. I imagine they will. And there will be a big fight over all of those issues in tribal court. But the point is the tribal court gets to decide those issues. But the tribal court has yet to decide in the face of the arbitration provision in the contract whether it can assert jurisdiction over this claim, right? No. The tribal court has said it has jurisdiction. It has jurisdiction. Yes. There was an August 3rd order which was subsequently appealed by both sides. G.C.S.D. initially appealed that award to the Hualapai Court of Appeals on the grounds that the tribal court was incorrect, that it determined it had jurisdiction. The Hualapai Court of Appeals ordered the parties to file briefs about whether this was an interlocutory appeal or a final judgment. And under Hualapai law, interlocutory appeals are not allowed. We filed sort of a protective appeal on another issue. And just within the last two weeks, I believe, the Hualapai Court of Appeals came down and said, no, this is an interlocutory appeal. It's not allowed under our rules. So the case goes forward. And what's the next step in the tribal court? The court has the tribal court has signed a scheduling order. So we will be moving ahead with discovery and experts and the merits of the case. And at some point, the Hualapai Court of Appeals held that G.C.S.D. has not lost its rights to appeal the tribal court's determination that it had jurisdiction. And if, I suppose, if G.C.S.D. is dissatisfied with the award of just compensation in the tribal court, then they'll be back. And maybe they'll be happy with it, and everybody will go away. So we should be prepared to assume jurisdiction over another round of appeals. Or not. Or not. Or not. We'll talk about that later. Because we don't know what's going to happen in tribal court. And that's the whole point of exhausting the administrative remedies in tribal court, because that process may prevent us from coming back here again. Okay. I'd like to address two things, if I might. One is the relative harm. Do you have a question? Do you have a question? I think we understand the case. Oh, okay. Yeah. Unless you have something that isn't in your briefs or you really want to feel compelled to talk about. No. I was going to talk about relative harm and a little about the R.J. Williams case, but it seems like you understand that case as well. Well, I guess I do have one housekeeping matter. I think you have two outstanding – there are two outstanding motions, and I'm not sure who filed them off the top of my head, but one was to take judicial notice of the arbitration award. Correct. And I think there was a second. Yes. We asked you to take judicial notice of the tribal court's two orders, August 3rd orders, and the Wallapai Court of Appeals order. Right. And you haven't issued an order on those. No. That was just, I think, within the last week, just because that's the last week or so. Okay. So as far as you know, those are the only two housekeeping matters we have to take care of. Yes. Okay. Thank you. All right. Your Honor, just to clarify, the minute order that Judge King entered said that the jurisdictional determination is preliminary. So that issue is not resolved. We understand that. Let me ask you the same question, though. Any other housekeeping matters? Well, there's a major housekeeping matter, it seems to me, that this claim about arbitration somehow being done or being able to operate, I mean, the arbitration award that has been entered is only for the past management fees. There's absolutely no present valuation that's been undertaken. And the reason is the tribe has taken the position that they condemn this contract and they don't have to show up or participate in arbitration. Well, we can't. The problem with these things when people start getting into judicial notice, it started with the concept that it was just to show that certain things were taking place. Now it's escalated to the point that people want us to get down into the weeds in those proceedings and decide what. And we're not going to do, you know, we're not going to do that. You know, we're not going to look at those proceedings from that perspective if the point is that, you know, we can look at that something happened on what the order says on a particular day, but we're not going to get in the weeds and go through every hearing. Fair point, Your Honor. So. So is there any other outstanding motion for judicial notice that we have not ruled on? Not that I'm aware of, sir. Okay. All right. Mr. Ides, so on the merits, we appreciate your argument today, all counsel, as a learning matter, because you're from a major firm. I have to say that the opening brief, I don't know who wrote the opening brief, but it was offensive. It was over the top in its histrionics and its use of inflammatory language. And I just, I got slapped down years and years and years ago because I made some intemperate remarks, or my associate did, in a brief. And I actually got, you know, published opinion where they admonished me for doing that. So I want to be a little kinder and make it as a teaching moment, because the judges on the appellate court don't react well to over the top briefs, whether they're get vituperative or histrionic. So your argument today has been just fine. That's good. But tone is a lot. And just for the credibility of briefing, keep in mind that we don't react well to jury-style arguments. I appreciate that point, Your Honor. May I also say that, and ask a question, did you like the reply tone better? Yes. Actually, I did. I made notes. I have notes on those briefs. I have a big frown face on the opening brief. And you didn't get that on the reply brief. And if I may respond, I thank the Court. I take sole responsibility for that. I also would say that part of the emotion of this case has been the Chinese box and never being able to have a remedy and losing millions of dollars. We've all litigated. We know it. We've been there. We understand your client frustration. We understand your client frustration. And I apologize to my counsel as well on that point. We understand there's a lot of money involved and the clients are very anxious, but it helps us if we can kind of take it in measured stride. Well, there's also the whole issue of being told water will applies when those of us who litigate in this area all the time know that water will does not preclude the relief that I'm seeking here. Okay. Let's draw it there. Thank you. All right. Counsel, thank you again for the arguments. We are in adjournment. And this case is submitted. Thank you.
judges: Fisher, Tallman, Callahan